IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

GHULAM MOHAMMED, *et al.*,           )
                                     )
            Petitioners,             )
                                     )
      v.                             )        Civil Action No. 06-CV-1680 (RL)
                                     )
DONALD RUMSFELD,                     )
      Secretary, United States Department of )
      Defense, *et al.,*             )
                                     )
            Respondents.             )
_____

**RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE
AND MOTION TO DISMISS FOR LACK OF JURISDICTION**

Respondents submit this response to this Court's order, filed on November 17, 2006, to

show cause why a writ of habeas corpus should not be issued in this case. This proceeding

should be dismissed because this Court lacks jurisdiction to hear it. Petitioners are 25

individuals who claim to be citizens of Afghanistan and Libya and detained by the United States

Department of Defense at Bagram Airfield, a United States military base in Afghanistan. They

allege, through their purported next friends,[1] that the detention violates their rights in several

_____

[1] A person other than the detained person may file an application for a writ of habeas
corpus and establish standing as a "next friend." The putative "next friend" bears the burden of
establishing his next friend status and justifying the exercise of the Court's jurisdiction over the
action. *See Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990) ("'[N]ext friend' standing is by no
means granted automatically to whomever seeks to pursue an action on behalf of another."). The
putative next friend must show that he has a significant relationship with the detainee on whose
behalf he claims to file a petition for writ of habeas corpus, and that the detainee cannot
challenge the legality of his detention. *Id.* at 163-64. The putative next friends in this case,
however, do not make this showing. In fact, one of the putative next friends, Omar Deghayes, is
a detainee at the Guantanamo Bay Naval Base in Cuba, *see* (<<http://www.dod.mil
/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf>>) (Deghayes listed as ISN 727), and
the petition merely asserts that he is a friend of several of the petitioners in this case.

respects.

Even assuming the facts alleged in the petition to be true,[2] this Court lacks jurisdiction to review this petition.  Aliens captured outside United States territory and held there as enemy combatants are not entitled to habeas relief in the United States courts.  Other than in the special circumstances presented by the Guantanamo Bay Naval Base discussed in *Rasul v. Bush*, 542 U.S. 466 (2004), the federal habeas statute has never been interpreted to apply to provide aliens held at military bases overseas a right to habeas relief.  *Rasul* held that the habeas statute conferred jurisdiction on federal courts to hear habeas petitions by detainees in the custody of the United States military at Guantanamo Bay.  *Rasul*, however, dealt with a military base over which, for more than a century, the foreign sovereign expressly has consented to the United States' "complete jurisdiction and control."  *Id.* at 480.  There is no such consent by the government of Afghanistan regarding Bagram Airfield, nor does the United State exercise "plenary and exclusive jurisdiction" over Bagram as is the case at Guantanamo Bay.  *Id.* at 475. Instead, the United States' use of Bagram Airfield, along with the significant presence of multinational forces there, is a wartime necessity subject to a rather typical lease with the host nation.  Thus, consistent with *Rasul*, the petitioners have no statutory habeas rights in the United States.

---

[2]  This is a problematic assumption in light of the difficulties in even identifying petitioners among the detainees at Bagram.  *See* Declaration of Colonel James W. Gray, attached as Exhibit A [hereinafter "Ex. A"], ¶¶ 7-11.  Except for two petitioners, Maulvihameedullah and Haji Mullah Abdul Razaq, who appear to be among the detainees at Bagram, *id.* ¶ 5, and two others, Ghanam Gul and Animullah, *id.* ¶ 6, who appear to be among those already released from Department of Defense custody, respondents are unable to confirm the identities of the other petitioners as Bagram detainees.  In fact, for at least four petitioners, respondents simply have no record of having detained any one at Bagram by the same or closely similar name.  *Id.* ¶ 11.  For purposes of this response and the motion to dismiss, however, respondents will assume the truth of the allegations in the petition.

Further, the recently enacted Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, removes all doubt that aliens outside of the United States lack any statutory habeas rights. The MCA explicitly divests this Court of jurisdiction to review habeas petitions filed by or on behalf of an alien detainee held by the United States as an enemy combatant. *See* MCA § 7(a). The MCA applies to all pending cases on the date of its enactment, such as the present petition. *Id.* § 7(b). Accordingly, because Petitioners Maulvihameedullah and Haji Mullah Abdul Razaq are alien enemy combatants in the custody of the Department of Defense, *see supra*, at 1 n.1, this Court has no jurisdiction to review their habeas petition under the MCA.

Nor do the petitioners have an independent right to habeas relief under the Suspension Clause of the Constitution. In light of the enactment of the MCA, petitioners are left with the extraordinary position that every enemy combatant detained by the United States military, anywhere in the world, has a constitutional right to petition the civilian courts of the United States for review of his detention. This position is contrary to settled law that aliens who have no significant voluntary connection with this country and are detained by the United States outside its sovereign territory have no rights under the Constitution, and therefore none under the Suspension Clause. *See Johnson v. Eisentrager*, 339 U.S. 763 (1950); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). The Supreme Court specifically held in *Eisentrager* that aliens captured and held abroad by the United States military have no constitutional right to habeas relief.[3] *See* 399 U.S. at 777, 784-85. *Eisentrager* is the controlling law on this constitutional question. Permitting alien enemy combatants abroad the privilege of seeking habeas relief in our civil courts now would require not only overruling controlling Supreme Court precedent but also upsetting the long-standing principle that the Constitution does not

---

[3] Indeed, the detention of enemy combatants during an armed conflict is a necessary attribute and by-product of war. *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-19 (2004).

apply extraterritorially to aliens.  Moreover, the expansion of habeas jurisdiction to cover
thousands, if not tens of thousands, of enemy combatants in both current and future armed
conflicts would have a crippling effect on our war efforts and invite considerable practical
difficulties in connection with such litigation.

Should this Court nevertheless find that petitioners have a colorable claim, respondents
respectfully request that this Court stay this proceeding pending resolution of *Al Odah, et al. v.
United States,* 05-5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.), by
the Court of Appeals for the District of Columbia Circuit. [4]  Among the issues in those
Guantanamo detainees' appeals are whether alien combatants detained outside of the United
States have any constitutional rights (including rights under the Fifth Amendment and the
Suspension Clause), and whether the Geneva Convention creates any judicially enforceable
rights.  The Court of Appeals has ordered supplemental briefing, which was completed on
November 20, 2006, regarding the significance of the MCA.  Given the national significance of
these issues, any grant of habeas relief now would be unwarranted.

## BACKGROUND

### I.    Bagram Airfield in Afghanistan

Bagram Airfield is located approximately 40 miles north of Kabul in the Parwan Province
of the Islamic Republic of Afghanistan.  The airbase played a key role during the Soviet
occupation of Afghanistan, providing close air support for Soviet and Afghan troops in the field.
Between at least 1999 and 2001, the Taliban and the Northern Alliance forces actively contested
control over the airbase, with the base changing hands several times.  In the military campaign

---

[4]  At a minimum, the Court should allow respondents to wait to provide a further factual
response to the petition until such time as the significant jurisdictional barriers to the claims
raised here have been resolved.

against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the Airfield starting in late 2001 and early 2002, along with multinational armed forces, and had priority use of the Airfield for coalition operations. *See* Declaration of Colonel James W. Gray, attached as Exhibit B [hereinafter "Ex. B"], ¶ 4. Today, the U.S. military force at Bagram Airfield is partnered with the Afghan National Security Forces, as well as other multinational forces, to conduct full spectrum operations to defeat al Qaeda, the Taliban, and associated movements. *See id.* ¶ 2. Its mission is to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan. *See id.*

Since at least 2003 and consistent with Afghan sovereignty, the United States has entered into several lease agreements with the government of Afghanistan regarding the use of the land and facilities at Bagram Airfield. *Id.* ¶ 5. The most recent agreement, which is similar to prior agreements, was executed on September 28, 2006. *Id.;* Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America ["Consignment Agreement"], attached as Ex. 1 to Gray Decl. (Ex. B) Pursuant to that agreement, Afghanistan, as the "host nation," consigns all facilities and land located at Bagram Airfield "for use by the United States and Coalition Forces for military purposes." Consignment Agreement at 1; Ex. B, ¶ 5. The United States, as the "lessee," has exclusive use and possession of the premises during the existence of the Agreement without rent or any other consideration. Consignment Agreement at 1 and ¶¶ 5, 9. The Agreement specifically warrants that Afghanistan is the sole owner of the premises or otherwise has the right, without any restrictions, to grant the "use" of the premises. *Id.* ¶ 8. It also includes a hold-harmless provision whereby Afghanistan agrees that all claims arising out of the United States' possession of the premises may be directed to Afghanistan for processing and payment, if any. *See id.* The Agreement is to continue in effect until the United States or its successor

determines that it no longer needs the premises. *Id.* ¶ 4; Ex. B, ¶ 5.

Many different activities are conducted at Bagram Airfield, which has a significant multinational military presence. Ex. B, ¶ 6. While the United States guards the Airfield, there are numerous national compounds located within the Airfield, with each nation separately controlling access to its respective compound. *Id.* Afghans also regularly have access to the Airfield. *Id.* ¶ 7. They range from local nationals performing contracted work to representatives of the Government of Afghanistan who assist in detainee citizenship interviews. *Id.* In addition, the United States operates a detention facility at Bagram Airfield known as the Bagram Theater Internment Facility ("BTIF") to hold some of the aliens (that is, non-Americans) believed to be either members or supporters of al Qaeda, the Taliban or associated movements. *Id.* ¶ 8. The Department of Defense ("DoD") has registered these detainees with the International Committee of the Red Cross ("ICRC"), and the ICRC regularly accesses the facility to conduct private interviews with the detainees there. *Id.* ¶ 9. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF. *Id.*

The Secretary of Defense has issued guidelines regarding the assessment of DoD detainees' enemy combatant status in Afghanistan. *See id.* ¶ 11. In accordance with those guidelines, the detaining combatant commander, or his designee, must review the initial enemy combatant determination made in the field within 90 days of a detainee's capture. *Id.* This review is based on all relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. *Id.* If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. *Id.* The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and

6

reach a recommended determination regarding the detainee's status. *Id.* After the initial 90-day status review, the detaining combatant commander, or his designee, is required to reassess the detainee's status annually. *Id.* If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released. *Id.* Since the war began in Afghanistan, the United States has captured, screened and released many individuals. *Id.* ¶ 8.

At the BTIF, the detainees' enemy combatant status reviews are conducted within 75 days of capture and every six months thereafter. *Id.* ¶ 12. The commanding general in charge of Bagram Airfield has established an Enemy Combatant Review Board ("ECRB") to conduct these reviews. *See id.* The ECRB is a panel of five commissioned officers who evaluate the detainees' status based on a variety of information, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee. *Id.* The ECRB makes its recommendation regarding a detainee's status by a majority vote, and forwards that recommendation to the commanding general, or his designee, for final determination. *Id.*

Even if an Afghan detainee is determined to be an enemy combatant, that person may be transferred to the Government of Afghanistan pursuant to a national reconciliation program. *See id.* ¶¶ 13-14. Sponsored by the Government of Afghanistan, this reconciliation program is designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives. *Id.* ¶ 14. DoD has released Afghan detainees from the BTIF pursuant to this program as part of the United States' ongoing effort to support the Government of Afghanistan in its program for strengthening peace. *Id.* These detainees are returned by the Government of Afghanistan to their village elders for reintegration into society. *Id.* In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, the United States anticipates transferring a significant percentage of the Afghan

detainees at the BTIF to the Government of Afghanistan in the foreseeable future. *See id.* ¶ 15. To accomplish that arrangement, the United States is currently funding the renovation of an Afghan prison, known as the Afghan National Detention Center. *Id.* The United States is also providing other aid to the Government of Afghanistan regarding the operation of that prison, both to facilitate these transfers and to ensure that the detention facility would meet international standards. *Id.* Detainees who are nationals of third countries and some Afghan detainees, however, will remain in DoD custody. *Id.* ¶ 17.

Petitioners Maulvihameedullah and Haji Mullah Abdul Razaq were captured in Afghanistan and were determined to be an enemy combatant. *See* Ex. A, ¶ 5. They are detained at the BTIF, and the Enemy Combatant Review Board's most recent reevaluation of their status was on August 17, 2006. *See id.* Following that review, their status as enemy combatants was again validated. *See id.* Petitioners Ghanam Gul and Animullah are not believed to be detainees at the BTIF. *See id.* ¶ 6. As for the remaining petitioners, respondents are unable to confirm their identities as detainees at BTIF. *See id.* ¶¶ 7-11; *supra*, at 1 n.1.

## II. The Statutory Background

Generally, federal district courts have authority "within their respective jurisdictions" to consider a request for habeas corpus relief made by petitioners claiming to be held in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(a), (c). Two years ago, the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466 (2004), that the habeas statute could be invoked by aliens detained by the U.S. military as enemy combatants at the Guantanamo Bay Naval Base in Cuba. Although recognizing *Eisentrager*'s holding that enemy combatants captured and detained outside the United States lacked any constitutional right to habeas corpus, the Court held that the habeas statute provided the detainees with a statutory right to relief.

In response to *Rasul*, Congress amended the habeas statute specifically to preclude federal

8

courts jurisdiction over habeas claims, except as provided by the judicial review provisions in the amendment itself.   That amendment, the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) (2005), vested exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review the validity of any final determination of a Combatant Status Review Tribunal ("CSRT"), and of any final decision of a military commission, regarding detainees at Guantanamo Bay.  *See* DTA § 1005(e)(2) (2005).  Beyond those provisions, however, Congress provided that "no court, justice, or judge shall have jurisdiction to hear or consider . . .  an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." DTA § 1005(e)(1) (2005).

Although the DTA's provision withdrawing jurisdiction "t[ook] effect on the date of [its] enactment," *see* DTA § 1005(h)(1) (2005), the Supreme Court in *Hamdan v. Rumsfeld*, found no congressional intent to apply the provision retroactively, and thus, held the provision inapplicable to the habeas petition before it, which was filed prior to the enactment of the Act.   548 U.S. __, 126 S. Ct. 2749, 2762-69 (2006).

In response to this and other holdings in *Hamdan*, Congress enacted the Military Commissions Act of 2006 to clarify the jurisdictional restrictions on habeas petitions filed by alien enemy combatants.  That statute specifies that the DTA's jurisdiction-limiting provision is applicable "to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."  MCA § 7(b). The MCA also expanded the jurisdictional restrictions to cover habeas petitions filed by or on behalf of not only those alien enemy combatants detained at Guantanamo Bay, but all those in the custody of the United States anywhere in the world.  *See id.* § 7(a).

9

Thus, the habeas statute now provides that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," except as provided in section 1005(e)(2) and (e)(3) of the Detainee Treatment Act.  *See* MCA § 7(a).  The latter provisions gave the D.C. Circuit exclusive jurisdiction to determine the validity of "any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and of "any final decision rendered by a military commission," with regard to anyone held by the United States.[5] *See* DTA § 1005(e)(2)(A), (e)(3)(A); MCA §§ 9, 10.

## ARGUMENT

## I.      THIS COURT LACKS JURISDICTION TO REVIEW THE PRESENT PETITION

### A.      The Law Is Settled That Aliens Outside the United States Are Outside the Scope of the Writ

This Court has no jurisdiction to grant the relief sought by petitioners, who are far outside the reach of the habeas statute.  Even before the enactment of the MCA, the habeas statute has never been interpreted to apply to aliens held in foreign territories by the United States, except under the unique circumstances relating to the United States' control over the Guantanamo Bay

---

[5]  There is no mandate in the DTA, or the MCA, that the military conduct CSRTs for enemy combatants that it captures.  As noted above, there are currently no CSRTs at Bagram, only an Enemy Combatant Review Board, which is charged with validating the detainees' enemy combatant status but is not the functional equivalent of a CSRT.  Indeed, Congress was aware that the procedures used for determining a detainee's enemy combatant status differ depending on whether the detainee is held at Guantanamo or in Afghanistan or Iraq, and that CSRTs are conducted at only Guantanamo.  *See* DTA § 1005 (a) (requiring the Secretary of Defense to submit a report setting forth procedures of "[CSRTs] and Administrative Review Boards . . . that are in operation at Guantanamo Bay" and for determination of the status of aliens in DoD custody in Afghanistan and Iraq).  Nevertheless, the MCA's jurisdiction-limiting provision is written broadly to cover all detainees who have been "determined by the United States" to be enemy combatants or are awaiting such determination.  *See* MCA § 7(a).

Naval Base. The habeas statute, which authorizes federal courts to grant habeas corpus relief "within their respective jurisdictions," 28 U.S.C. § 2241(a), was not intended to allow foreign nationals taken captive during military operations overseas and held in foreign lands to have the military decision to hold them reviewed by federal district courts. The territorial extension found in the unique circumstances of Guantanamo Bay does not similarly apply to the battlefield of Afghanistan.

In *Rasul v. Bush*, 542 U.S. 466 (2004), the Supreme Court held that the federal habeas statute extended to aliens detained as enemy combatants at the U.S. military base at Guantanamo Bay, Cuba. That holding rested on the unique agreement the United States had with Cuba regarding the Guantanamo Bay Naval Base, and Cuba's specific consent to the United States' "plenary and exclusive jurisdiction" over the base for more than a century. 542 U.S. at 471. As the Court noted, the 1903 Lease Agreement between the two governments provided that "the United States shall exercise complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]," *id.* at 471 (emphasis added); *see also* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 ("1903 Lease"); and according to the Court, the United States "may continue to exercise such control permanently if it so choose." *Id.* at 480 (citing 1903 Lease, Art. III; Treaty on Relations with Cuba, May 29, 1934, U.S.-Cuba, 48 Stat. 1082, T.S. No. 866, Art. III). As interpreted by the Supreme Court, *id.* at 480-81, that control brought Guantanamo Bay within the meaning of the habeas statute, particularly the phrase "within their respective jurisdictions." 22 U.S.C. § 2241.

As noted, petitioners cannot rely on *Rasul* because Congress subsequently amended the habeas statute through the MCA. But even had Congress taken no action, the logic of *Rasul* would not extend toward conferring habeas jurisdiction to every military facility that the United States operates throughout the world. In contrast to the "complete jurisdiction and control,"

11

which may be exercised by the United States, the United States enjoys no similar mandate regarding Bagram Airfield. Nor does the current use of the base by the United States military and coalition forces for military operations render the airbase a jurisdictional territory of the United States. The Accommodation Consignment Agreement between the United States and Afghanistan regarding Bagram Airfield – no different from any ordinary lease agreement – speaks of only "exclusive, peaceable, undisturbed and uninterrupted possession" and "use" of the leased premises. *See* Consignment Agreement ¶ 9. The Agreement recognizes Afghanistan as a "host nation," and the United States as a "lessee." *Id.* at 1. Moreover, the United States' use of Bagram Airfield is necessitated by its war against the Taliban and al Qaeda. Ex. B, ¶ 4. A military base on foreign soil in a zone of active military operations is hardly the type of territory that is under unchallenged and indefinite control of the United States like Guantanamo Bay such that it was within a federal court's jurisdiction. Thus, petitioners could not rely on *Rasul* even if the MCA had not expressly made the jurisdictional issue clear in this case.

**B.     The MCA Reaffirms the Well-Settled Principle That Aliens Outside of the United States Have No Habeas Rights and Removes All Doubt as to the Lack of Jurisdiction In This Case**

Erasing any doubt that might exist about it, Congress has enacted the Military Commissions Act and thereby has made abundantly clear that this Court lacks jurisdiction over alien detainees' habeas corpus petitions. The MCA provides, in relevant part, that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." *See* MCA § 7(a). The MCA expressly applies "to all cases, without exception, pending on or after the date of the enactment of this Act, which relate to any aspect of the detention, transfer, treatment, trial, or

conditions of detention of an alien detained by the United States since September 11, 2001," *id.* § 7(b), which would include this case challenging petitioners' detention.

Petitioners Maulvihameedullah and Haji Mullah Abdul Razaq have been determined by the Department of Defense to be enemy combatants, and their status was reconfirmed as recently as August 2006. *See* Ex. B, ¶ 5. The plain language of the MCA therefore squarely forecloses this Court's review of their habeas petition. "Without jurisdiction [a] court cannot proceed at all in any cause." *Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside of this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co of America*, 511 U.S. 375, 377 (1994). Accordingly, this Court should dismiss the petition for want of jurisdiction.

## II.    PETITIONERS HAVE NO CONSTITUTIONAL RIGHTS UNDER THE SUSPENSION CLAUSE

### A.    The Suspension Clause Has No Extraterritorial Application

Petitioners also allege that they have an independent right to habeas relief under the Suspension Clause of the Constitution, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2. This argument, however, is foreclosed by settled Supreme Court caselaw. *See Johnson v. Eisentrager*, 339 U.S. 763 (1950). In *Eisentrager*, a group of German nationals – who were captured in China by U.S. forces during World War II and imprisoned in a U.S. military base in Germany – sought habeas relief in federal court. Although the military base in Germany was controlled by the U.S. Army, *id.* at 766, the Supreme Court held these prisoners to have no constitutional right to habeas relief in federal

court.  This is so because the prisoners "at no relevant time were within any territory over which the United States is <u>sovereign</u>, and the scenes of their offense, their capture, their trial, and their punishment were all beyond the territorial jurisdiction of any court of the United States."  *Id.* at 777-78 (emphasis added).   The Court further held the Fifth Amendment inapplicable to these aliens because, in reasoning fully applicable to the Suspension Clause, there is no textual or historical support for  "[s]uch extraterritorial application of organic law."  *Id.* at 782-85; *see also id.* at 768.  As the Court noted, such application "would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment.  Not one word can be cited.  No decision of this Court supports such a view. . . .  None of the learned commentators on our Constitution has ever hinted at it. The practice of every modern government is opposed to it."  *Id.* at 784-85.

As the Supreme Court later explained, *Eisentrager*'s rejection of constitutional claims by alien prisoners in U.S. custody at a military base abroad was emphatic because aliens have no constitutional rights outside United States sovereign territory.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990); *see also Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992) (Haitians interdicted by U.S. Coast Guard on the high seas "have no recognized substantive rights under the laws or Constitution of the United States."); *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.").  In *Zadvydas v. Davis*, the Court similarly confirmed the "well established" principle that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."  533 U.S. 678, 693 (2001).

Like the *Eisentrager* prisoners, petitioners Maulvihameedullah and Haji Mullah Abdul

14

Razaq are aliens captured abroad and at all relevant times detained at a U.S. military base outside the sovereign territory of the United States. While the United States leases the military base from Afghanistan, the United States does not have sovereignty over that foreign territory. To the contrary, the Accommodation Consignment Agreement between the United States and Afghanistan specifically recognizes that Afghanistan, as the "host nation," is merely consigning the "use" of the premises to the United States and the coalition forces for military purposes. *See* Ex. B, ¶ 5; Consignment Agreement at 1. There is no agreement that in so doing Afghanistan is also ceding sovereignty over the premises to the United States. In fact, the very mission of the United States military force at Bagram is to enhance the sovereignty of Afghanistan, among other things. *See* Ex. B, ¶ 2.

Indeed, courts have repeatedly recognized that the establishment of a military base in foreign territory does not effect a transfer of sovereignty in the United States–and no court has ever held to the contrary. *See United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by the United States under lease with Great Britain, was outside United States sovereignty because the governing lease had "effected no transfer of sovereignty"); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[A] United States military base is not sovereign territory of the United States."); *Holder v. Holder*, 392 F.3d 1009, 1020 n.10 (9th Cir. 2004) (recognizing U.S. air force base in Germany not under United States sovereignty). Were it otherwise, the court in *Eisentrager*, which also involved the detention of aliens in a U.S. military base abroad, would have been compelled to reach a different result. In sum, under settled law, the lack of United States sovereignty over Bagram Airfield precludes the attachment of any

15

constitutional rights.

**B.    *Rasul v. Bush* Is Not Relevant to the Constitutional Question**

Petitioners rely on *Rasul v. Bush* to contend that Bagram Airfield is "subject to U.S.

constitutional . . . law" because it is allegedly under the "complete jurisdiction and control" of the

United States military.  Pet. ¶ 67.  *Rasul* does not support petitioners' constitutional argument

because the Court emphasized that its holding addressed only the reach of the federal habeas

statute.  *See* 542 U.S. at 476-79; *see also id.* at 489 (Scalia, J., dissenting) ("The petitioners do not

argue that the Constitution independently requires jurisdiction here.").  Far from overruling settled

law under *Eisentrager* and its progeny ruling that the Constitution does not apply extraterritorially

to aliens, *Rasul* expressly distinguished between the statutory and constitutional holdings of

*Eisentrager* and limited its analysis to the proper interpretation of section 2241.  *See id.* at 476-79.

Specifically, it found that Cuba's express consent to the United States' "complete jurisdiction and

control over and within [the Guantanamo Bay Naval Base]" brought the base within the meaning

of the habeas statute's distinctive phrase "within their respective jurisdictions."  *Id.* at 471; *see* 28

U.S.C. § 2241(a).  Given the additional fact that "the statute dr[e]w[] no distinction between

Americans and aliens held in federal custody," the Court held that "[a]liens held at the base, no

less than American citizens, [were] entitled to invoke the federal courts' authority under § 2241."

*Rasul*, 542 U.S. at 484 (emphasis added).

To be sure, in interpreting the habeas statute, the Court in *Rasul* also examined "the

historical reach of the writ," noting that at common law, courts exercised habeas jurisdiction over

the claims of not only "aliens detained within sovereign territory of the realm," but also "persons

detained in the so-called 'exempt jurisdictions,' where ordinary writs did not run, and all other

dominions under the sovereign's control."  *Id.* at 481-82 & nn. 11-13.  This observation, however,

16

is not about the application of the writ to aliens abroad because the "persons" cited by the Court to be in "exempt jurisdictions" or other dominions under the sovereign's control were all citizens (or subjects) of the sovereign that was holding them. *See id.* at 481-82 nn. 12-13. And as the Supreme Court long ago noted in *Eisentrager,* "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." 339 U.S. at 770. "Even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens," *id.* at 769, not to mention alien enemies. Indeed, even "[a]t common law 'alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war.' (1 Blackstone at 372, 373)." *Id.* at 775 (quoting *Citizens Protective League v. Clark*, 155 F.2d 290, 293 (D.C. Cir. 1946)); *see also Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779) (petitioners, as prisoners of war, were "not entitled to any of the privileges of Englishmen; much less to be set at liberty on habeas corpus"); *Moxon v. The Fanny*, 17 F. Cas. 942 (D. Pa. 1793) (courts "will not even grant a habeas corpus in the case of a prisoner of war, because such a decision on this question is in another place, being part of the rights of sovereignty").

Moreover, *Rasul* discussed the common law in the context of interpreting congressional intent under the habeas statute. After concluding that there was "little reason to think that Congress intended the geographical coverage of [§ 2241] to vary depending on the detainee's citizenship," *Rasul,* 542 U.S. at 481, the Court then went on to note that such an interpretation would be consistent with the historical reach of the writ. *Id.* at 481-82. The question before the Court consistently was a statutory one, and as the Court's holding makes clear, "§ 2241 confers upon the Court jurisdiction to hear petitioners' habeas corpus challenges . . . ." *Id.* at 484 (emphasis added).

17

*Eisentrager* and its progeny remain the controlling law on whether the Constitution has extraterritorial application to aliens, and the predicate for such application is sovereignty, not control, over the territory. Indeed, in *Rasul*, even as it framed the question for review, the Court fully recognized a distinction between "ultimate sovereignty" and "plenary and exclusive jurisdiction" at Guantanamo Bay. 542 U.S. at 475 ("The question now before us is whether the habeas statute confers a right to judicial review of the legality of Executive detention of aliens in a territory over which the United States exercises 'plenary and exclusive jurisdiction,' but not 'ultimate sovereignty.'"). "[C]ontrol and jurisdiction" is not "equivalent to sovereignty." *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1424-25, 1428 (11th Cir. 1995) (alien migrants located at Guantanamo Bay have no First Amendment rights). Because the United States does not have sovereignty over Bagram Airfield, alien detainees at Bagram, such as petitioners Maulvihameedullah and Haji Mullah Abdul Razaq, have no right to habeas relief in our civil courts.

**C.    *Rasul* Cannot be Read to Support the Extraterritorial Application of Constitutional Habeas Rights to Alien Detainees at Bagram Airfield**

Even if *Rasul*'s statutory holding is read to support an extension of constitutional protections to aliens in territories not within the United State's sovereignty, that extension goes no farther than Guantanamo Bay. As discussed above, Guantanamo Bay occupies a status that is unlike Bagram Airfield. For over a century, the United States has exercised "complete jurisdiction and control" over the base with Cuba's consent, *Rasul*, 542 U.S. at 471, whereas Afghanistan's only consent regarding Bagram is that United States may use it for military operations. *See* Consignment Agreement at 1. Moreover, unlike Guantanamo Bay, Bagram Airfield is in the zone of war and there is also a significant multinational force there. *See* Ex. B, ¶

6.  To provide alien enemy combatants captured at the battlefield and detained in a theater of war the privilege of access to our civil courts is unthinkable both legally and practically.  As the Supreme Court has observed,

> It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.  Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779.  Whether the meaning of the Suspension Clause could be thought to have expanded with the evolution in statutory habeas since the founding (*see INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001) (reserving the question)), even a modern interpretation of the Clause would not encompass this scenario.  The logistical difficulty of providing thousands of alien enemy combatants – who have never reciprocally agreed to the societal obligations in our country – access to our civil courts alone would cripple even the administration of our judicial system, not to mention its effect on our war effort at a time of active hostilities.

### D.     Petitioners Lack Substantial Voluntary Connections to the United States Sufficient to Trigger Constitutional Protections

Even if military installations such as Bagram Airfield can be considered to be like sovereign territory of the United States, petitioners Maulvihameedullah and Haji Mullah Abdul Razaq's complete lack of connection to the United States would still deny him protections under the Constitution.   As the Supreme Court explained in *Eisentrager*, "the alien has been accorded an ascending scale of rights as he increases his identity with our society," 339 U.S. at 770, and the privilege of litigation has been extended to aliens "only because permitting their presence in the country implied protection."  *Id.* at 777-78.   Thus, an alien seeking constitutional protections

19

must establish not only that he has come within the territory over which the United States has

sovereignty, but also that he had "developed substantial voluntary connections with this country."

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 271-72 (1990); *accord Jifry v. FAA*, 370 F.3d

1174, 1182 (D.C. Cir. 2004); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799

(D.C. Cir. 2002) (a "foreign entity without property or presence in this country has no

constitutional rights, under the due process clause or otherwise") (quoting *People's Mojahedin*

*Org. of Iran v. Department of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).

    In *Verdugo-Urquidez*, the Supreme Court held that a non-resident alien, who had no

previous significant voluntary connection with the United States and was involuntarily transported

to the United States and held against his will, had no Fourth Amendment right with respect to the

search of his property abroad by U.S. agents.  494 U.S. at 271.  The Court reasoned that presence

in the United States that is "lawful but involuntary [] is not of the sort to indicate any substantial

connection with our country."  *Id.*  Even more clearly here, petitioners – who do not allege to have

any connections at all to the United States –  cannot claim any constitutional protections.

Accordingly, the petition should be dismissed.  *See Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), –

F. Supp. 2d –; 2006 WL 3625015, *9 (D.D.C. Dec. 13, 2006) (dismissing habeas petition by alien

enemy combatant held at Guantanamo because the petitioner did not have a constitutional right to

habeas and because the MCA validly divests the district court of jurisdiction).

## CONCLUSION

    For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction,

or in the alternative, stay the proceeding pending resolution of *Al Odah, et al. v. United States,* 05-

5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.).  At a minimum, the

respondents should not be required to provide a further response to the petition until after the

20

serious jurisdictional issues raised here have been resolved.

Dated:  December 22 , 2006                    Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             DOUGLAS N. LETTER
                                             Terrorism Litigation Counsel


                                               /s/   Jean Lin
                                             _____
                                             JOSEPH H. HUNT (D.C. Bar No. 431134)
                                             VINCENT M. GARVEY (D.C. Bar No. 127191)
                                             JUDRY L. SUBAR (D.C. Bar No. 347518)
                                             JEAN LIN
                                             JAMES LUH
                                             Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W.
                                             Washington, DC  20530
                                             Tel:  (202) 514-3716
                                             Fax:  (202) 616-8470

                                             Attorneys for Respondents

**EXHIBIT A**

**(Declaration of Colonel James W. Gray)**
**4 pages**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GHULAM MOHAMMED, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-01689 (RJL) |
| | ) | |
| DONALD RUMSFELD, | ) | |
| Secretary, United Stated Department of | ) | |
| Defense, *et al.*, | ) | |
| | ) | |
| Respondents. | | |

## DECLARATION OF COLONEL JAMES W. GRAY

I, Colonel James W. Gray, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-76 ("CJTF-76"), as well as Commander of Detention Operations, CJTF-76. The statements in this declaration are based upon information made available to me in the performance of my official duties.

2.  CJTF-76 is headquartered at Bagram Airfield in Afghanistan. CJTF-76, along with Afghan National Security Forces, conducts full spectrum operations to defeat al Qaeda, the Taliban, and associated movements. CJTF-76 integrates joint, interagency and multinational forces partnered with the Afghans in order to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.

3.  Task Force Guardian, a subordinate unit of CJTF-76, is under United States national command and control. Task Force Guardian is responsible for operating the Bagram Theater

1

Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility located at Bagram Airfield. I have served as the Commander of Task Force Guardian and Commander of Detention Operations, CJTF-76, since December 1, 2006. In this position, I am responsible for all aspects of detention operations for CJTF-76.

4. I have reviewed the habeas petition filed in this action.

5. For the following two Petitioners, our records reflect that we are currently detaining at the BTIF Afghan citizens with the same or closely similar names and whose fathers' names are the same or closely similar to the names of these two Petitioners' fathers:

    a. Maulvihameedullah. This detainee was captured in Afghanistan. The Enemy Combatnat Review Board ("ECRB") last reviewed his enemy combatant status on August 17, 2006. Following that review, his status as an enemy combatant was validated.

    b. Haji Mullah Abdul Razaq: This detainee was captured in Afghanistan. The ECRB last reviewed his enemy combatant status on August 17, 2006. Following that review, his status as an enemy combatant was validated.

6. For each of the following two Petitioners, our records reflect that we had previously detained at the BTIF a citizen of Afghanistan with a closely similar name and whose father's name was closely similar to the name of the Petitioner's father: Ghanam Gul and Animullah (s/o Mohammed Shah). Both of these detainees have been released from Department of Defense custody.

7. For Petitioner Gul Rehman, our records reflect that we had previously detained at the BTIF two citizens of Afghanistan with a closely similar name to the name listed in the petition.

(The petition did not provide the name of this Petitioner's father.) Both of these detainees have been released from Department of Defense custody. Without additional information, we are unable to conclude whether either of these individuals is the Petitioner.

8. For Petitioners Sardar Mohammed and Sahdar Khan, our records reflect that we currently detain or have detained at the BTIF two individuals with names closely similar to "Sardar Mohammed" and two with names closely similar to "Sahdar Khan." (The petition did not provide the name of these Petitioners' fathers.) One individual by each name has been released, and one individual by each name is still in detention. Without additional information, we are unable to conclude whether any of these individuals are the Petitioners.

9. For the following eleven Petitioners, our records reflect that we currently detain or have detained citizens of Afghanistan at the BTIF with the same or closely similar names to those listed in the petition. However, the names of the petitioners' fathers do not match the names of these individuals' fathers: Ghulam Mohammed, Animullah (s/o Habid Ullah), Zafir Khan, Raheem Ullah, Nazar Mohammed, Mohibullah, Gul Mohammed, Mohammed Ayub, Rahmatullah, Mohammad Ayub and Haji Sadar Mohammed.

10. For the following three Petitioners, who allege that they are citizens of Libya, our records reflect that we do not have Libyan detainees at BTIF with the same or similar names: Hasan Balgaid, Salih and Muhammed Dawood.

11. For the following four Petitioners, we have no record of detaining any individuals at BTIF by the name in the petition or by a closely similar name: Malik Abdual Rahim, Maulvi Naeem, Mohammed Yaqoub Akhoundzada and Mohabud Din.

I declare under the penalty of perjury under the laws of the United States of America that

3

the foregoing is true and correct based on information currently available to me.

Executed on __21__ December 2006.

JAMES W. GRAY
Colonel, U.S. Army
Commander, Task Force Guardian
Commander of Detention Operations,
Combined/Joint Task Force-76

4

**EXHIBIT B**

**(Declaration of Colonel James W. Gray and Attachment)**
**12 pages**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GHULAM MOHAMMED, *et al.*,

                  Petitioners,

              v.

DONALD RUMSFELD,
    Secretary, United Stated Department of
    Defense, *et al.*,

                  Respondents.

Civil Action No. 06-CV-01680 (RJL)

---

## DECLARATION OF COLONEL JAMES W. GRAY

I, Colonel James W. Gray, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I currently serve as Commander of Task Force Guardian, Combined/Joint Task Force Force-76 ("CJTF-76"), as well as Commander of Detention Operations, CJTF-76. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. CJTF-76 is headquartered at Bagram Airfield in Afghanistan. CJTF-76, along with Afghan National Security Forces, conducts full spectrum operations to defeat al Qaeda, the Taliban, and their affiliates and supporters. CJTF-76 integrates joint, interagency and multinational forces partnered with the Afghans in order to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan.

3. Task Force Guardian, a subordinate unit of CJTF-76, is under United States national command and control. Task Force Guardian is responsible for operating the Bagram Theater

1

Internment Facility ("BTIF"), a Department of Defense ("DoD") detention facility located at the

Bagram Airfield. I have served as the Commander of Task Force Guardian and Commander of

Detention Operations, CJTF-76, since December 1, 2006. In this position, I am responsible for

all aspects of detention operations for CJTF-76.

### Bagram Airfield, Afghanistan

4. Bagram Airfield is located approximately forty miles north of Kabul in the Parwan

province of the Islamic Republic of Afghanistan ("Afghanistan"). In the military campaign

against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the

base starting in late 2001 and early 2002, along with multinational armed forces, and had priority

use of the airfield for coalition operations. The United States' use of Bagram Airfield was and

is necessitated by its ongoing war against al Qaeda, the Taliban and their affiliates and

supporters.

5. U.S. and coalition military operations are conducted from Bagram Airfield. Currently,

the nature of the United States' use of Bagram Airfield is pursuant to an Accommodation

Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic

Republic of Afghanistan and the United States of America, executed on September 28, 2006.

See Exhibit 1 (Lease Agreement). This agreement follows similar such arrangements dating

back to at least 2003. Under this Agreement, Afghanistan, as the "host nation," consigns all

facilities and land located at Bagram Airfield "for use by the United States and coalition forces

for military purposes." This Agreement continues until the United States (or its successors)

determines that the premises are no longer required for its use.

6. A significant multinational presence exists at Bagram Airfield as part of CJTF-76's

mission.  While the United States guards Bagram Airfield, there are numerous national

compounds located within it.  Each nation separately controls access to its respective compound

on the Airfield.  The United States does not have complete, plenary jurisdiction on Bagram

Airfield.

      7.  Afghan citizens enter Bagram Airfield on a daily basis.  These Afghans range from

local nationals performing contracted work (such as cleaning services) to representatives of the

Afghan government.

### The Bagram Theater Internment Facility

      8.  The United States and its multinational partners are conducting an ongoing military

campaign against al Qaeda, the Taliban regime, and their affiliates and supporters in

Afghanistan.  During the execution of this campaign, the U.S. Armed Forces and allied forces

have captured or procured the surrender of thousands of individuals believed to be members or

supporters of either al Qaeda or the Taliban.  Since the war began in Afghanistan, the United

States has captured, screened and released many individuals.  A small percentage of these

individuals are or have been detained at the Bagram Theater Internment Facility.  The detention

of these enemy combatants prevents them from returning to the battlefield and engaging in

further armed attacks against innocent civilians and U.S. and coalition forces.  Detention also

serves as a deterrent against future attacks by denying the enemy the fighters needed to conduct

war. Interrogations during detention enable the United States to gather important intelligence to

prevent future attacks.

      9.  DoD has registered individuals held under its control at the BTIF with the

International Committee of the Red Cross ("ICRC").  The ICRC has regular access to this

facility and conducts private interviews with detainees. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF.

### Assessment of Enemy Combatants in Afghanistan

10. Detainees under DoD control in Afghanistan are subject to a review process that first validates whether an individual is an enemy combatant. This status (as an enemy combatant) is initially determined at the place of capture.

11. By direction of the Secretary of Defense, within 90 days of a detainee being brought under DoD control, the detaining combatant commander, or his designee, shall review the initial enemy combatant determination made in the field. Such review is based on all reasonably available and relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. After the initial 90-day status review, the detaining combatant commander, or his designee, is required, on an annual basis, to reassess the status of each detainee. If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released.

12. In Afghanistan, this review process is conducted by the Commanding General, CJTF-76, under the authority delegated by the Secretary of Defense through the combatant

4

commander.    As noted above, Secretary of Defense guidance requires a review of the detainee's enemy combatant status by the 90-day point and annually thereafter.  At the BTIF, however, such reviews are usually conducted within 75 days of capture and every six months thereafter. CJTF-76 is responsible for establishing the Enemy Combatant Review Board ("ECRB") to accomplish these reviews.  The ECRB is a panel of five commissioned officers who evaluate the detainees' status and make a recommendation by majority vote to the Commanding General, CJTF-76, or his designee as to detainees' status.  ECRB decisions are based on information derived from a variety of sources, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee.   The specific implementing guidance for the ECRBs is classified, as are the documents prepared regarding the ECRB's evaluation of the detainee's status.

### Enemy Combatants at Bagram

13. Even if an individual is determined to be an enemy combatant following the reviews discussed above, there are several ways in which the detainee can leave DoD custody in Afghanistan.

14. The Government of Afghanistan sponsors a national reconciliation program designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives in Afghan society.  The ECRB process described above nominates Afghan detainees from the BTIF for entry into the reconciliation program.  Once nominated, individuals are vetted and selected by a Government of Afghanistan commission for return to their village elders and reintegration into society.  After DoD releases detainees to the custody of the Government of Afghanistan for participation in this program, the United States no

5

longer exercises any custody or control over these former detainees.

15.  In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, a significant percentage of the Afghan detainees at the BTIF are expected to be transferred to the Government of Afghanistan, likely within the next year.  The United States is currently funding the renovation of an Afghan prison, the Afghan National Detention Center. The United States is also providing other aid to the Government of Afghanistan regarding the operation of this prison, both to facilitate these transfers and to ensure an Afghan detention capability which meets international standards.  The prison is to be owned and operated by the Government of Afghanistan.

16.  Under certain circumstances, the detaining combatant commander is authorized to permit the release of certain enemy combatants (including citizens of Afghanistan) from the BITF to their home countries.  The criteria and procedures for that program are classified. Following the release of these individuals, the United States no longer exercises any custody or control over these former detainees.

17.  Some Afghan detainees and detainees who are nationals of third countries are expected to remain in DoD custody.

Executed on **22** December 2006.

Colonel James W. Gray
Colonel, U.S. Army
Commander, Task Force Guardian
Commander of Detention Operations,
Combined / Joint Task Force-76

6

**EXHIBIT 1**

**(Attached to Declaration of Colonel James W. Gray)**

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

## ACCOMMODATION CONSIGNMENT AGREEMENT

### FOR LANDS AND FACILITIES AT

### BAGRAM AIRFIELD

### BETWEEN

### THE ISLAMIC REPUBLIC OF AFGHANISTAN

### REPRESENTED BY

### HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE

### AND

### THE UNITED STATES OF AMERICA

This **ACCOMMODATION CONSIGNMENT AGREEMENT** made and entered into this 28th day of September 2006, by and between **THE ISLAMIC REPUBLIC OF AFGHANISTAN, REPRESENTED BY HIS EXCELLENCY GENERAL ABDUL RAHIM WARDAK, MINISTER OF DEFENSE, OF THE OFFICE OF THE MINISTRY OF DEFENSE**, hereinafter referred to as the **HOST NATION**, and The **UNITED STATES OF AMERICA**, hereinafter referred to as the **LESSEE**, or the **UNITED STATES:**

WITNESSETH THAT:

WHEREAS: The **UNITED STATES** and the **HOST NATION**, hereinafter referred to jointly as the **PARTIES**, wish to enter into an Accommodation Consignment Agreement, hereinafter referred to as the Agreement, whereby the **HOST NATION** consigns all facilities and land located at **BAGRAM AIRFIELD, PARWAN** owned by the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, for use by the **UNITED STATES** and Coalition Forces for military purposes; and.

WHEREAS: The **MINISTER OF DEFENSE**, is the bona fide representatives of the **HOST NATION** for all Real Estate matters legal or otherwise pertaining to or occurring at **PARWAN PROVINCE;** and has authority to execute Real Estate documents on behalf of **THE ISLAMIC REPUBLIC OF AFGHANISTAN;** and

WHEREAS: The **PARTIES** further desire that all previous Real Estate and use agreements at **PARWAN PROVINCE**, between the **UNITED STATES** and the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS, or OTHERS**, will be terminated upon the execution of this Agreement by both **PARTIES**.

NOW THEREFORE, in accordance with the desires of the **PARTIES** and in consideration of the mutual benefits to be derived therefrom, the **PARTIES** hereto mutually covenant and agree as follows:

1. The **HOST NATION** hereby consigns to the **UNITED STATES** to have and to hold for the exclusive use of the **UNITED STATES** Forces land, facilities, and appurtances currently owned by or otherwise under the control of the **HOST NATION**, or **PARWAN PROVINCE**, or **PRIVATE INDIVIDUALS**, or **OTHERS**, at **PARWAN PROVINCE**, hereinafter referred to as "the Premises" described as: One parcel

HN_____

US _____

PARWAN PROVINCE                                    DACA-AED-5-06-6559
                                                   BAGRAM AIRFIELD

of land containing approximately 8082 jeribs (approximately 16,164,248 square meters) located within
PARWAN Province, Afghanistan, and more particularly described as located within the following grid
coordinates:

42SWD2165165842
42SWD2220765799
42SWD2285465102
42SWD2297564547
42SWD2297263721
42SWD2301863125
42SWD2309363085
42SWD2371563710
42SWD2437965919
42SWD2506864666
42SWD2653864898
42SWD2787565943
42SWD2722267302
42SWD2561568407
42SWD2587668650
42SWD2575668797
42SWD2609869452
42SWD2573668823
42SWD2549369261
42SWD2482269430
42SWD2481868906
42SWD2441469060
42SWD2420468236
42SWD2356868275
42SWD2265766138
42SWD2240365893
42SWD2274064648
42SWD2371364596
42SWD2384764764
42SWD2382964921
42SWD2275065491
42SWD2257165535
42SWD2248166374
42SWD2311267244
42SWD2430968936
42SWD2669664709
42SWD2701864970
42SWD2369868338

as shown in purple in Exhibit "A", attached hereto and made a part of this agreement, to be used for
LESSEE'S purposes.

2. The **UNITED STATES** shall have the right to assign this agreement to a successor nation or
organization. This agreement in its entirety shall apply to the **UNITED STATES** and the successor nations
or organizations, hereinafter referred to as "the Successor."

3. The **UNITED STATES** shall have the right to enter into a Lease or Local Administrative Agreement
with successor nations or organizations for any and all fixtures, additions, alterations, improvements, or
structures owned by the **UNITED STATES** and located on the property which is the subject of this
agreement.

4. The term of this Agreement shall commence the earlier the date of execution by the **HOST NATION**,
or 31 days from the date of this Agreement and shall continue until the **UNITED STATES** or its
successors determine that the Premises are no longer required for its use.

HN_____

US_____

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

5. The HOST NATION makes the Premises available to the UNITED STATES without rental or any other consideration for use of the Premises.

6. The UNITED STATES shall be responsible for obtaining and making payment of all other charges for utilities and services it deems necessary to its operations, including but not limited to heat, electricity, hot water, refuse collection, annual cleaning and adjustment of heating systems. Arrangements and payments of utilities and services used shall be made by separate contract.

7. The UNITED STATES shall have the right, during the existence of this Agreement, to make alterations and additions, including, but not limited to grade, condition, installing drainage facilities, place gravel or hard stand, attach fixtures, erect improvements and structures or signs, and remove all obstructions which may constitute a hindrance, in or upon the Premises. Any such fixtures, additions, alterations, improvements or structures, so placed in upon or attached to the said Premises, shall remain the property of the UNITED STATES and, at the option of the UNITED STATES, may be left in place, removed or otherwise disposed of by the UNITED STATES, except as otherwise directed in this Agreement. If the UNITED STATES elects to leave in place any or all of the said additions, fixtures, structures or improvements, it shall have no further obligation with respect to restoration of any of the Premises to the previous condition. Any such fixtures, structures or improvements abandoned by the UNITED STATES shall become the property of the HOST NATION.

8. The MINISTER OF DEFENSE hereby warrants and guarantees that the HOST NATION is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises. The HOST NATION will hold the UNITED STATES harmless against any claim arising out of the UNITED STATES' possession of land encompassed by the Premises. Any person that brings a claim for possession of land encompassed by the Premises will be directed to the HOST NATION through the MINISTRY OF DEFENSE or its representative, who shall process the claim and make a decision to accept the claim or deny the claim, whichever the HOST NATION deems appropriate. In cases where the HOST NATION makes a decision to honor the claim, the HOST NATION is responsible for payment. While HOST NATION adjudicates any claim by any third party, HOST NATION, authorizes the UNITED STATES to continue to with operations and maintain exclusive control of the area described in this Agreement

9. The HOST NATION covenants and warrants that the UNITED STATES shall have exclusive, peaceable, undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The UNITED STATES shall hold and enjoy the Premises during the period of this agreement without any interruption whatsoever by the HOST NATION or its agents.

10. Any notice under the terms of this consignment agreement, including by the UNITED STATES to give notice of its intent to terminate the Agreement, shall be in writing signed by a duly authorized representative of the party giving such notice, and if given by the UNITED STATES, or the Successor in possession, a copy shall be addressed to:

HE GENERAL ABDUL RAHIM WARDAK
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
THE ISLAMIC REPUBLIC OF AFGHANISTAN
KABUL, AFGHANISTAN

and if given by the HOST NATION, shall be addressed to:

ATTN: CREST                                         U. S. ARMY CORPS OF ENGINEERS
CJTF76 CJ7                                          SAVANNAH DISTRICT
BAGRAM AIRFIELD, AFGHANISTAN        or,        ATTN: SASRE
                                                   100 WEST OGLETHORPE STREET
                                                   P.O. BOX 889
                                                   SAVANNAH, GEORGIA 31402-0889

HN_____

US_____

PARWAN PROVINCE

DACA-AED-5-06-6559
BAGRAM AIRFIELD

11. The UNITED STATES or the Successor in possession of the Premises shall have the right to terminate this agreement in whole or in part by providing HOST NATION written notice of its intent. If the Agreement is terminated in part, the terms and conditions of the Agreement remain in full force and effect for the remaining Premises.

12. If any Successor elects to terminate this Agreement, in whole or in part, during its use of the Premises, the UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use of the surrendered Premises to the HOST NATION. The UNITED STATES shall have use of the surrendered Premises on the date of its notice to the HOST NATION. If the UNITED STATES does not provide said notice, the surrendered Premises shall revert to the possession of the HOST NATION.

13. This Agreement supersedes all previous agreements between the UNITED STATES and HOST NATION for the use of Bagram Airfield, including, but not limited to Accommodation Consignment Agreement numbered DACA-AED-5-06-472 dated 30 AUGUST 2006.

14. This Agreement is executed in English. A courtesy translation may be furnished to the HOST NATION. In the event of inconsistency between any terms and conditions of this Agreement and its translation, the English language version shall have precedence and control.

IN WITNESS WHEREOF, the PARTIES hereto have hereunto subscribed their names.

FOR THE ISLAMIC REPUBLIC OF AFGHANISTAN:

Witness: _____

HE GENERAL ABDUL RAHIM WARDAK        (DATE)
MINISTER OF DEFENSE
OF THE OFFICE OF THE MINISTRY OF DEFENSE
KABUL, AFGHANISTAN

AND

FOR THE UNITED STATES OF AMERICA:

9-26-2006

Witness: _____

CHRISTOPHER D. DIRR                  (DATE)
REALTY CONTRACTING OFFICER
CONTINGENCY REAL ESTATE SUPPORT TEAM (CREST)
PURSUANT TO AUTHORITY GRANTED BY THE SECRETARY OF THE ARMY
CJTF76 CJ7
BAGRAM AIRFIELD, AFGHANISTAN
DSN: (318) 231-2925

HN_____

US_____

# Reference Map: Bagram



Afghanistan 1:1,000,000

Orientation Map

**Projected Coordinate System:**
WGS 1984 UTM Zone 42N
Projection: Transverse Mercator
False Easting: 500000.00000000
False Northing: 0.00000000
Central Meridian: 69.00000000
Scale Factor: 0.99960000
Latitude Of Origin: 0.00000000
Linear Unit: Meter
**Geographic Coordinate System:**
GCS WGS 1984
Datum: WGS 1984
Prime Meridian: 0
Angular Unit: Degree
Source Data: CJ7 Database

**Legend**

**Cities**
**Classification**
- National Capital
- Province Capital
- District Center
- Major City

**Road Infrastructure**
**Road Class**
- National Highway
- Primary Road
- Secondary Road
- Tertiary Road

**1:1,000,000**

N
W        E
S

0   12.5   25      50      75      100
Kilometers

**Reference Map**

Produced On 25SEP06